1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11

12   DOUGLAS LEON,                    )     Case No. CV 14-2102-RT (KK)
                                      )
13                   Petitioner,      )     FINAL REPORT AND
                                      )     RECOMMENDATION OF UNITED
14            v.                      )     STATES MAGISTRATE JUDGE
                                      )
15   F. FOULK, Warden,                )
                                      )
16                   Respondent.      )
                                      )
17   ─────────────────────────────────)

18          This Final Report and Recommendation is submitted to the Honorable Robert J.

19   Timlin, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and

20   General Order 05-07 of the United States District Court for the Central District of

21   California.

22                                          I.

23                          SUMMARY OF RECOMMENDATION

24          Douglas Leon ("Petitioner"), a California state prisoner proceeding pro se, has

25   filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254,

26   challenging his convictions for first degree murder and attempted extortion.  Petitioner

27   alleges various constitutional violations, including erroneous denial of a Batson/Wheeler

28   motion, erroneous denial of a Pitchess motion, erroneous admission of improper

                                            1

argument by the prosecutor, insufficient evidence of premeditation, and denial of his right to a jury trial.  For the reasons that follow, the Petition should be denied in its entirety.

## II.

## PROCEDURAL HISTORY

On March 29, 2011, after a jury trial in the Superior Court of California, County of Los Angeles, Petitioner was convicted of one count of first degree murder, Cal. Penal Code § 187(a), and one count of attempted extortion, Cal. Penal Code §§ 524, 664-65. Clerk's Transcript ("CT"), Vol. 2[1] at 458-59, 502-05; Reporter's Transcript ("RT"), Vol. 4[2] at 2702, 2703-04.[3]  The jury also found true allegations that (1) the crimes were perpetrated for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of Cal. Penal Code §§ 186.22(b)(1)(B) and (4); and (2) in each of the crimes Petitioner personally and intentionally discharged a firearm within the meaning of Cal. Penal Code §§ 12022.5(a) and 12022.53(b)-(e).  2 CT at 458-59; 4 RT at 2702-04.  On April 15, 2011, the trial court sentenced Petitioner to a prison term of 50 years to life.  2 CT at 496-98, 502-05; 4 RT at 3007.

On July 2, 2012, Petitioner appealed his convictions to the California Court of Appeal.  Lodg. 1-3.  On April 22, 2013, the California Court of Appeal affirmed the judgment in an unpublished opinion.  Lodg. 4.

On May 31, 2013, Petitioner filed a petition for review with the California Supreme Court.  Lodgs. 5, 6.  On July 31, 2013, the California Supreme Court denied the petition without comment.  Lodg. 6.

---

[1]  The copy of the Clerk's Transcript lodged by Respondent has not been identified with a lodgment number.  The Court thus refers to the lodgment simply as the Clerk's Transcript or "CT."

[2]  The copy of the Reporter's Transcript lodged by Respondent has not been identified with a lodgment number.  The Court thus refers to the lodgment simply as the Reporter's Transcript or "RT."

[3]  Petitioner was acquitted of the attempted murders of Andy Monroy, Angel Sanchez, and Tiffany Byone.  2 CT at 460-62; 4 RT at 2703.

On March 19, 2014, Petitioner filed the instant Petition in this Court.  On September 5, 2014, Respondent filed an Answer to the Petition ("Answer").  Petitioner filed a Traverse on November 17, 2014.

Thus, this matter has been submitted for decision.

### III.

### FACTUAL BACKGROUND

For a summary of the facts, this Court relies on the California Court of Appeal's opinion:[4]

> . . . [T]he evidence established that on January 15, 2010, defendant was a member of the criminal street gang known as the Maywood Locos, which claimed the 5500 block of Gifford Avenue in the City of Maywood as their territory and considered the Orchard Locos to be their rivals.  At about 9:30 that Friday night, 16–year–old Bryan and two friends, 17–year–old Angel and 15–year–old Tiffany, were waiting to get into a party at that location when defendant fatally shot Bryan five times.  Fifteen-year-old Andy M. was shot in the leg as he was running from the scene.
>
> *A. Eyewitness Testimony*
>
> Bryan's childhood friend, Angel, testified that he and his girlfriend, Tiffany, walked with Bryan to the party that night.  Defendant and four companions came out of the party and approached the threesome as they were waiting to get in.  Defendant asked Angel and Bryan, "Where you from?"  Angel replied, "I don't bang.  I ain't from nowhere."  Bryan, who was standing to Angel's left, did not respond.  As he turned to speak to Tiffany on his right, Angel kept an eye on Bryan and defendant, because he was concerned.  Angel saw defendant move behind Bryan's left shoulder, pull a gun out of his waistband with his right hand and fire five shots toward Bryan and Angel.  Bryan jerked back and when Angel turned he saw Bryan on the ground and defendant running north still holding the gun.
>
> Angel and Tiffany ran south, to a house on the corner of Gifford Avenue and 56th Street, where Angel saw another young man who had been shot in the leg enter.  From there, Angel called 911 and reported that a gang member had

---

[4]   Because this factual summary is drawn from the California Court of Appeal's opinion, "it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence."  Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2008) (citations omitted).  In his Objections to the original Report and Recommendation, Petitioner alleges the summary is inaccurate.  Objections at 2.  The Court has independently reviewed the trial record and finds the summary accurate.

3

just shot his best friend.  While waiting outside for the police to arrive, Angel saw a car pull up in front of the house; defendant, still holding a gun, got out of the front passenger seat and another person got out of the backseat of that car; Angel made eye contact with defendant.  At the sound of the approaching police cars, defendant and his companion got back into the car, which drove away.  Defendant was wearing a black Dodger's jacket over a black T-shirt; he had a gang tattoo on his forehead but Angel could not recall what it said.  From a photographic lineup, Angel identified defendant as the shooter.

The account of the incident Tiffany gave to officers at the scene was the same as Angel's in all material respects.  She recalled that after Angel and Bryan said they were not in a gang, the man who had approached them walked past, then turned and fired five shots in their direction.  Tiffany described the shooter as an 18– to 20–year–old, 130 to 150 pounds, 5'8' male Hispanic with acne, a shaved head and the words "Maywood Loco" tattooed on his forehead; he was wearing a black Dodger's jacket, white T-shirt and pants of an unknown color.

Later that same night, Sergeant Frank Garcia tape recorded two interviews with Tiffany.  From a photographic lineup, she identified defendant as the shooter.  She recalled that defendant pulled out a silver gun and shot Bryan.  Tiffany did not remember seeing anyone being pushed and did not think Bryan said anything to upset defendant.  She also saw the brown car, in which she believed defendant was riding, pull up in front of the second house.

Contrary to what she said in her tape-recorded interview, Tiffany testified at trial that she never saw a gun but believed the shooter, who she did not identify, was a person with a tattoo because that person was standing in front of his three companions.  Tiffany did not want to testify against defendant because she was afraid of repercussions from his gang.

Sixteen-year-old Kevin told the police officer who interviewed him at the scene that he was one of three D.J.'s at the party that night.  Kevin was familiar with the Maywood Locos from living in the neighborhood and knew that defendant was a Maywood Loco.  Kevin had seen defendant with a chrome automatic pistol in his waistband at several parties in the past and on the night in question.

In a tape-recorded interview that same night, Kevin told Homicide Detectives Ralph Hernandez and Kevin Lowe that he saw defendant shoot Bryan.  Kevin recounted that sometime before the shooting, defendant asked Kevin, "What's up, man?  You bang?"  Kevin recognized the gun defendant was holding at the time as the same gun he had seen defendant holding at prior parties.  Kevin responded that he was "not from no where.  I said, I don't mess with Maywood Locos."  Defendant then announced that he was going to be "charging," which Kevin understood to mean collecting admission from people entering the party.  A little while later, Kevin saw defendant approach Bryan, Angel and Tiffany.  He heard defendant ask them, "You bang?"  In response,

Bryan tried to "act all hard" and pushed defendant; defendant responded by shooting Bryan in the leg and then the head.  Kevin heard as many as 10 gunshots.  From a photographic lineup, Kevin identified defendant as the shooter.

At trial, Kevin denied seeing the shooting, seeing defendant holding a handgun that night or at any other time, and that he had identified defendant as the shooter.

Andy, who was shot in the leg in the incident, identified defendant as the shooter from a photographic lineup shown to him by police at the hospital the next day.  During his interview with police, he stated Bryan claimed to be from the Orchard Locos gang.

At trial, Andy maintained that he never saw the shooter but heard an argument involving two males followed by silence and then six gun shots. Andy did not recall talking to detectives at the hospital the next day or identifying defendant as the shooter from a photographic lineup.

*B. Gang Expert Testimony*

Former Maywood police officer and current Deputy Sheriff Andrew Serrata testified as the prosecution's gang expert.  Serrata explained that when a gang member asks someone, "Where are you from?" it is a challenge.  The gang member is trying to ascertain whether the other person is in a rival gang. The answer, even if the person denies gang membership, is often followed by violence.  "Snitches" are threatened, assaulted and sometimes killed by gang members.  It is not uncommon for witnesses in gang-related cases to be reluctant to testify for fear of retaliation.

Deputy Serrata was familiar with the Maywood Locos from being in school with members of that gang as well as from his work as a police officer. In 2005, Serrata was assigned to monitor the Maywood Locos.  Since then, he has investigated about 200 crimes involving that gang.  The Maywood Locos and the Orchard gang are rivals.  Serrata had known defendant for two or three years and knew him to be a member of the Maywood Locos.

The primary activities of the Maywood Locos are narcotics sales, assault, robbery, burglary, assault with a deadly weapon, attempted murder and murder. Deputy Serrata explained that Maywood Locos have to earn their tattoos:  a new member is allowed to get a small tattoo, usually the letter "M"; the more work that person puts in on behalf of the gang, the more and larger tattoos they can get; the "Maywood" tattoo on defendant's forehead indicates that he is a shot caller.

Based on a hypothetical posed by the prosecutor that mirrored the facts of the case, Deputy Serrata stated his opinion that the murder and attempted

murders were committed for the benefit of, at the direction of or in association with a Maywood Locos gang member.

Defense counsel posed his own hypothetical: if an Orchard Street gang member enters into Maywood Locos territory, is asked by a Maywood Locos gang member where he is from, responds by identifying himself as a member of Orchard Street and pushing the Maywood Locos gang member, "Do you, hypothetically speaking, anticipate some altercation occurring as a result of that contact?" Deputy Serrata responded affirmatively. Even if a person responded that he is "from no where," Serrata would be afraid of a shooting. In Serrata's opinion, if a gang member confronted three people, only one of whom was a rival gang member, and the gang member shot towards those three people, the gang member would have intended to shoot all three because he would perceive them to be threatening as a group.

Lodg. 4 at 2-6 (footnotes omitted).

## IV.
## PETITIONER'S CLAIMS FOR RELIEF

Petitioner's claims, as presented in his Petition, are as follows.

1.     Claim One: The trial court improperly adjudicated Petitioner's motion pursuant to <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978).

2.     Claim Two:  The trial court improperly adjudicated Petitioner's motion pursuant to <u>Pitchess v. Superior Court</u>, 11 Cal.3d 531 (1974).

3.     Claim Three: The trial court improperly admitted argumentative questions by the prosecutor.

4.     Claim Four: The evidence was insufficient to prove premeditation.

5.     Claim Five:  The trial court violated Petitioner's right to a jury trial by imposing fines without a finding by a jury.

Memorandum of Points and Authorities in Support of Petition, at 1-42.[5]  Respondent contends that all of these claims fail on the merits.  Answer, at 5-29.

///

---

[5]  Petitioner has attached to the Petition a 43-page document containing his legal arguments.  The Court refers to this document as a Memorandum of Points and Authorities in Support of Petition or "MPA."

1

# V.

2

## STANDARD OF REVIEW

3    A federal court may review a habeas petition by a person in custody under a state-

4    court judgment "only on the ground that he is in custody in violation of the Constitution

5    or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas relief is

6    not available for state-law errors. Swarthout v. Cook, 562 U.S. 216, 131 S. Ct. 859, 861,

7    178 L. Ed. 2d 732 (2011) (per curiam) (citing Estelle v. McGuire, 502 U.S. 62, 67, 112 S.

8    Ct. 475, 116 L. Ed. 2d 385 (1991)).

9    Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

10   federal court may not grant habeas relief on a claim adjudicated on its merits in state

11   court unless the adjudication:

12   (1)    resulted in a decision that was contrary to, or involved an unreasonable

13          application of, clearly established Federal law, as determined by the

14          Supreme Court of the United States; or

15   (2)    resulted in a decision that was based on an unreasonable determination of

16          the facts in light of the evidence presented in the State court proceeding.

17   28 U.S.C. § 2254(d).

18   "Clearly established federal law" means federal law that is clearly defined by the

19   holdings of the Supreme Court at the time of the state-court decision. See, e.g., Cullen v.

20   Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011). Although

21   only Supreme Court law is binding, "circuit court precedent may be persuasive in

22   determining what law is clearly established and whether a state court applied that law

23   unreasonably." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citation omitted).

24   In determining whether a decision is "contrary to" clearly established federal law, a

25   reviewing court must evaluate whether the decision "'applies a rule that contradicts

26   [such] law'" and how the decision "confronts [the] set of facts that were before the state

27   court.'" Cullen, 131 S. Ct. at 1399 (quoting Williams v. Taylor, 529 U.S. 362, 405, 408,

28   120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). If the state decision "'identifies the correct

1    governing legal principle' in existence at the time," a reviewing court must assess

2    whether the decision "'unreasonably applies that principle to the facts of the prisoner's

3    case.'" Id. (quoting Williams, 529 U.S. at 413).  An "unreasonable application" of law is

4    "'different from an incorrect application'" that law.  Harrington v. Richter, 562 U.S.

5    86, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011) (quoting Williams, 529 U.S. at 410)

6    (emphases omitted).  Similarly, a state-court decision based upon a factual determination

7    may not be overturned on habeas review unless the factual determination is "'objectively

8    unreasonable in light of the evidence presented in the state-court proceeding.'" Stanley,

9    633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

10       The AEDPA standard requires a high level of deference to state-court decisions,

11   such that a state court's decision will be upheld if "fairminded jurists could disagree as to

12   whether it was correct."  Gulbrandson v. Ryan, 738 F.3d 976, 990 (9th Cir. 2013)

13   (citation and internal quotation marks omitted).  Even if this Court finds such a state-

14   court error of clear constitutional magnitude, habeas relief is not available unless the error

15   "had substantial and injurious effect or influence in determining the jury's verdict."  Fry

16   v. Pliler, 551 U.S. 112, 116, 121–22, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (citations

17   and internal quotation marks omitted).

18       Where, as here, the California Supreme Court denies a petitioner's claims without

19   comment, the state high court's "silent" denial is considered to be "on the merits" and to

20   rest on the last reasoned decision on these claims.  See Ylst v. Nunnemaker, 501 U.S.

21   797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).  In the case of the instant claims,

22   the last reasoned decision is that of the California Court of Appeal in its decision on

23   direct review.

24   ///

25   ///

26   ///

27   ///

28   ///

# VI.

## DISCUSSION

**A.    Petitioner Fails to Demonstrate <u>Batson</u> Error**

**1.    Background**

In Claim One, Petitioner argues the prosecutor engaged in purposeful discrimination against Hispanics during jury selection and the trial court improperly denied Petitioner's motion pursuant to <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and <u>People v. Wheeler</u>, 22 Cal.3d 258 (1978).  MPA, at 1-22.

The California Court of Appeal accurately detailed the facts leading up to Petitioner's <u>Batson</u> motion, as follows:

The challenged jurors testified as follows:

• Juror No. 7317[, a Hispanic male[6],] lived in East Los Angeles, was married and had three small children.  His only experience with litigation was a workers' compensation case which he believed was handled appropriately. He knew no one working in law enforcement or the legal system and had never met a policeman. He had experience with rifles.  His family had not been affected by street gangs, but he had observed the effects of gang activity in his community.  He believed that gang members could tell the truth.  Asked if he could do the job of being a juror, he responded: "I am nervous about it.  I never done it before."  Juror No. 7317's opinion would not be affected if someone said the victim was a gang member.

• Juror No. 1530[, a Hispanic female,] lived in northeast Los Angeles, had a partner and a one-year-old daughter.  She had no prior jury experience, had never been a victim of, or witness to, a crime.  Her brother was awaiting trial on drug possession charges, and she had been with him at every court appearance. Although she believed that the evidence against her brother had been planted in his car, she did not have a negative impression of law enforcement.  Currently a student, Juror No. 1530 wanted to be a social worker and to work with children. She had heard of street gangs but was not familiar with them.  Recently, a school friend and his brother who were not gang members were shot and killed outside their home by gang members.  Despite this experience, she could remain objective in this case.

---

[6]  For the sake of this analysis, the Court presumes that Prospective Juror 7317 was Hispanic.  The trial court was not certain of the prospective juror's ethnicity and the prosecutor stated that she did not keep note of the prospective jurors' race or ethnicity. 2 RT at 665-66, 667.

9

1    • Juror No. 6504[, a Hispanic male[7],] lived in the San Gabriel Valley, was not
2    married and had never served on a jury. Asked whether he could think of any way
     in which street gangs had impacted his life, he stated, "No. Not really. There has
     been instances but nothing serious." Asked to elaborate, he said that when he was
3    younger there was a driveby shooting "a couple doors down" from his house.

4    • Juror No. 0151[, a Hispanic male,] lived in Santa Monica, was married and had
     two adult children. He had been an alternate juror in a criminal trial in which the
5    defendant was acquitted of possession of rock cocaine. Juror No. 0151 worked as
     a cook at a hospital; he did not have any opinion as to whether he was a good cook.
6    He knew that gangs existed but did not know anyone whose life had been affected
     by a gang. Asked whether he could listen to the testimony even if the victim was
7    a gang member, Juror No. 0151 stated, "No. I don't know anybody involved in this
     case. I have no judgment or opinions."

8
         The prosecutor exercised peremptory challenges to eight prospective jurors
9    including Nos. 7317, 1530 and 6504, without objection. After she exercised her
     ninth peremptory to excuse Juror No. 0151, defense counsel made a
10   *Batson–Wheeler* motion, arguing that the prosecutor was excusing all Hispanics.
     The trial court noted that there was still a diverse prospective jury panel, then
11   stated: "I'm not making a finding at this stage. But if you have any justification
     for your choices that you want to mention to refresh the court's recollection, it
12   would be helpful." The prosecutor responded that she excused Juror No. 7317
     because, although he said he saw the effect of gangs in his community, he
13   appeared accepting of them. She excused Juror No. 1530 because she appeared to
     have a problem with the police and her claim to have been unaffected by the recent
14   gang-related murder of two friends was not credible. She excused Juror No. 6504
     because she did not credit his claim that he could be objective despite a driveby
15   shooting that occurred down the street from his home. Finally, she excused Juror
     No. 0151 because he seemed too indecisive. This colloquy followed:
16
         "THE COURT: All right. I appreciate your refreshing the court's
17   recollection. And I don't see any pattern of abuse of the peremptory challenges
     here. Specifically related to Hispanics. [¶] Do you want me to go through all
18   the Asians as well or are you satisfied? [¶] [DEFENSE COUNSEL]: I'm
     satisfied. [¶] . . . [¶] THE COURT: Really, counsel, if I were to grant a
19   Wheeler motion, do you think we'd be any farther ahead in getting a fair jury?
     [¶] [DEFENSE COUNSEL]: No. I submit it. For example, I just don't recall,
20   and I know it's late in the day, but I don't recall anybody admitting being
     involved in gang activity. [¶] THE COURT: We've had a couple people that
21   have talked about one of their friends dating someone, having friends who have
     been falsely accused and convicted. [¶] [DEFENSE COUNSEL]: That's true.
22   [¶] THE COURT: So those are valid reasons. Okay. Thank you. I don't find a
     prima facie case. [¶] [DEFENSE COUNSEL]: Okay. That's fine. [¶] [THE
23   PROSECUTOR]: Thank you. Done."

24   Lodg. 4 at 7-9.

25   ///

26

27   _____
     [7]  The Court notes that the trial court initially referred to this juror as female. 2 RT
28   666. However, it is clear from the record that the juror was a male.

1

### 2.    State Court Opinion

2  The California Court of Appeal denied Petitioner's claim on direct appeal, finding

3  Petitioner had not established a prima facie case of group bias and substantial evidence

4  supported a finding that the prosecutor relied on race-neutral reasons in excusing the

5  jurors in question.  Lodg. 4 at 9-12.

6

### 3.    Legal Standard

7  The Equal Protection Clause prohibits the exercise of a peremptory challenge solely

8  on the basis of a prospective juror's race.  Batson, 476 U.S. at 89.  In Batson, the

9  Supreme Court established a three-step process for adjudicating a claim of racial

10  discrimination in jury selection.

11

### a.    Step One

12  At step one, the defendant must make a prima facie showing the prosecution has

13  exercised a peremptory challenge on the basis of race.  That is, the defendant bears the

14  burden of demonstrating the facts and circumstances of the case "raise an inference" of

15  discrimination.  Batson, 476 U.S. at 96.  At this first step, the defendant "must show (1)

16  the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a

17  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

18  inference that the strike was motivated by race."  Boyd v. Newland, 467 F.3d 1139, 1143

19  (9th Cir. 2006).  The step one analysis may include a review of the transcript of voir dire

20  in order to conduct a comparative analysis of the jurors who were stricken and the jurors

21  who were allowed to remain.  Crittenden v. Ayers, 624 F.3d 943, 956 (9th Cir. 2010)

22  ("[C]omparative juror analysis may be employed at step one to determine whether the

23  petitioner has established a prima facie case of discrimination.").

24

### b.    Step Two

25  At step two, if a defendant makes this prima facie showing, the burden shifts to the

26  prosecution to provide a neutral explanation for its challenge.  Batson, 476 U.S. at 97; see

27  Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) ("so long as

28  the reason offered is not inherently discriminatory, it suffices" at step two).  The

prosecutor must give a clear and reasonably specific reasons for his or her exercise of a peremptory challenge – reasons that must be related to the particular case being tried. Purkett v. Elem, 514 U.S. 765, 768-69, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam).  A "legitimate reason" need not be a reason that makes sense, is persuasive, or is even plausible, but it must be a reason that does not deny equal protection.  Id.  At this second step, the prosecutor's reasoning will be deemed race-neutral "'[u]nless a discriminatory intent is inherent in the prosecutor's explanation.'"  Id. at 768 (citation omitted).

### c.    Step Three

Finally, at step three, "[t]he trial court will [] have the duty to determine if the defendant has established purposeful discrimination."  Batson, 476 U.S. at 98.  At the third step, the court must evaluate the "persuasiveness" of the prosecutor's articulated reasons.  See Miller-El v. Cockrell, 537 U.S. 322, 338-39, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion).  "When conducting the analysis at the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination."  Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008).

A comparative juror analysis should also be employed at step three.  Miller-El v. Dretke ("Miller-El II"), 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).  The relevant portions of the record for this analysis includes not only the prosecutor's statements about his or her jury selection strategy and his or her explanations for the peremptory strikes, but also the characteristics of the venire members that were not challenged.  Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006); see also Miller-El II,

545 U.S. at 241 (finding that side-by-side comparisons of minority venire members who were struck and nonminority venire members allowed to serve are more powerful than bare statistics). "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar non[minority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson</u>'s third step." <u>Miller-El II</u>, 545 U.S. at 241. Thus, it is clear that when conducting a comparative juror analysis, courts must compare the excused jurors in question with similarly situated jurors who were allowed to remain on the jury.

"[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." <u>Purkett</u>, 514 U.S. at 768. However, "the third step of <u>Batson</u> primarily involves the trier of fact." <u>Kesser</u>, 465 F.3d at 359. The trial court "must evaluate the record and consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" <u>Id.</u> (quoting <u>Hernandez</u>, 500 U.S. at 363) (other internal quotation marks and citation omitted). Thus, when considering the "totality of the relevant facts" under <u>Batson</u>'s third step, courts "must review the record," including voir dire transcripts and venire members' questionnaires, to determine if a prosecutor's reasons for exercising a peremptory challenge are pretextual. <u>Id.</u> at 360, 371 (internal quotation marks and citation omitted).

### 4.   Discussion

The Court begins by assuming, without deciding, Petitioner has established a prima facie case at step one of the <u>Batson</u> analysis. <u>Cf.</u> <u>Johnson v. California</u>, 545 U.S. 162, 170, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (the first step of the <u>Batson</u> framework is not intended "to be so onerous that the defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination"); <u>Boyd v. Newland</u>, 467 F.3d 1139, 1145 (9th Cir. 2006) (noting that <u>Johnson</u> "emphasiz[ed] that the threshold for making a prima facie <u>Batson</u> claim is quite

low").  Next, at step two of the analysis, the prosecutor gave specific, race-neutral reasons for exercising peremptory challenges against the four prospective jurors in question.  Specifically, the prosecutor stated she struck the jurors because of a perceived sympathy toward gangs, a negative perception of police, a lack of emotion, and a passive demeanor.  2 RT at 666-69.  Thus, the Court's analysis focuses on step three of the Batson analysis.

Here, at step three, there is no evidence to suggest the prosecutor's reasons for striking the four prospective jurors were merely pretexts for purposeful discrimination.

### a.      Prospective Juror 7317

The prosecutor used her first peremptory challenge to excuse Prospective Juror 7317, a Hispanic male.[8]  2 RT at 331, 665-66.  At the time of Petitioner's Batson/Wheeler motion, the prosecutor had difficulty remembering Prospective Juror 7317.  However, she stated she excused the prospective juror because he appeared to be "more sympathetic to gangs." 2 RT at 666-67.  Support for the prosecutor's reasoning can be inferred from the record.  For example, Prospective Juror 7317 stated he believed a gang member could tell the truth. 2 RT at 29.  He also stated that he would not be affected by evidence the victim may have been a member of a gang. 2 RT at 329.  Importantly, this is a legally valid reason for excusing a prospective juror.  Cf. United States v. Stinson, 647 F.3d 1196, 1207 (9th Cir. 2011) (prospective juror's personal familiarity with gangs proper justification for removal).

Moreover, when comparing Prospective Juror 7317 to seated jurors, it is apparent that the prosecutor did not seat any juror who was similarly situated to Prospective Juror 7317.  Although seated Juror No. 4 had a brother who was in a gang, 2 RT at 366, nothing that juror said indicated an acceptance of gang activity or suggested that Juror No. 4 would be sympathetic to gang members.

///

---

[8]  Prospective Juror 7317 was seated in the Juror No. 1 position when he was excused. 2 RT at 24, 331.

1

**b.     Prospective Juror 1530**

2       The prosecutor used her second peremptory challenge to excuse Prospective Juror

3  1530, a Hispanic female.[9]  2 RT at 343, 666.  The prosecutor explained she excused

4  Prospective Juror 1530 because she appeared to have a negative perception of police in

5  light of her brother's current legal trouble and, despite her desire to work in the often

6  emotionally charged area of social work, she appeared alarmingly unaffected by the

7  recent murder of a friend and his brother.  2 RT at 667-68.  The prosecutor's stated

8  reasons for excusing Prospective Juror 1530 are supported by the record.  Prospective

9  Juror 1530 informed the trial court her brother had narcotics charges pending against him

10  in the same courthouse.  Supplemental RT at 2.  The prospective juror explained her

11  belief the drug evidence found in her brother's possession was planted.  Supplemental RT

12  at 3.  Prospective Juror 1530 also stated she hoped to become a social worker.

13  Supplemental RT at 3.  Finally, the prospective juror stated one of her close friends and

14  his brother had been killed about six months before Petitioner's trial.  Supplemental RT

15  at 4-6.  Although the record does not clearly reflect a lack of emotion on the part of the

16  prospective juror, as described by the prosecutor, neither does the record indicate

17  Prospective Juror 1530 was particularly emotional when recounting the details of her

18  friend's killing.

19       The reasoning provided by the prosecutor with respect to Prospective Juror 1530

20  was legally sufficient to support her strikes.  See, e.g., Mitleider v. Hall, 391 F.3d 1039,

21  1048 (9th Cir. 2004) (brother's conviction for cocaine possession was a facially neutral

22  reason for challenging juror); United States v. Crawford, 413 F.3d 873, 875 (8th Cir.

23  2005) ("There is no Batson violation when a juror is dismissed because juror's relatives

24  have been prosecuted or convicted of a crime.").

25       In addition, when comparing Prospective Juror 1530 to seated jurors, it is clear the

26  prosecutor excused the juror out of a concern for potential bias and not due to improper

27  _____

28       [9]  Prospective Juror 1530 was seated in the Juror No. 3 position when she was
excused.  2 RT at 24, 343.

1  racial discrimination.  Ultimately, the prosecutor did not allow to be seated any

2  prospective juror who appeared to be particularly unemotional or who admitted a relative

3  was being prosecuted, had been convicted of a crime, or was treated unfairly by the

4  criminal justice system.  Although seated Juror No. 4 had a brother who was a gang

5  member, he did not state his brother had been prosecuted for any crimes.  2 RT at 366.

6  Nor did Juror No. 4 appear to be unaffected by a traumatic event, as prospective juror

7  1530 had.

8              c.     **Prospective Juror 6504**

9         The prosecutor used her fourth peremptory strike to excuse Prospective Juror 6504,

10  a Hispanic male.[10]  2 RT at 361, 666.  The prosecutor explained she exercised a

11  peremptory challenge against Prospective Juror 6504 because he had been involved in

12  minor gang activity and did not appear to believe that a nearby drive-by shooting was a

13  serious incident.  2 RT at 668.  When the prosecutor stated the prospective juror had been

14  involved in minor gang activity, it appears she was referring to an incident in which there

15  was a drive-by shooting near his home and a boy at school with gang ties told him not to

16  say anything to anyone about the incident.  2 RT at 322-23.  Prospective Juror 6504 also

17  suggested he might be emotionally unfit to sit as a juror because he could potentially

18  "feel bad for someone."  2 RT at 324.  As with Prospective Juror 1530, the cold record

19  does not allow for any insight into whether Prospective Juror 6504 was emotional about

20  the drive-by shooting near his home.  However, the record does indicate that the

21  prospective juror discussed the incident calmly, as if to have been rather unaffected by

22  the shooting.  See 2 RT at 321-22; Supplemental RT at 10.

23         On this record, the Court finds the prosecutor provided valid, race-neutral reasons

24  for excusing Prospective Juror 1530.  See United States v. Stinson, 647 F.3d 1196, 1207

25  (9th Cir. 2011) (finding prosecutor properly struck juror who had "personal familiarity

26  with gangs"), cert. denied, --- U.S. ----, 132 S. Ct. 1768, 182 L. Ed. 2d 551 (2012).

27  _____

28     [10]  Prospective Juror 6504 was seated in the Juror No. 4 position when he was excused.
   2 RT at 24, 361.

1    Furthermore, after conducting a comparative analysis, the Court finds that the

2    prosecutor's stated reasons for excusing Prospective Juror 6504 were not pretexts for

3    purposeful discrimination.  None of the seated jurors admitted having been a witness to a

4    gang-related crime about which they were encouraged not to talk, or expressed the

5    potential for feeling sympathetic toward individuals involved at trial.

6                    **d.    Prospective Juror 0151**

7    Finally, the prosecutor used her ninth peremptory challenge to excuse Prospective

8    Juror 0151, a Hispanic male.[11]  2 RT at 664, 666.  The prosecutor explained she excused

9    Prospective Juror 0151 because he was unable to give concrete answers to many of the

10   voir dire questions, which might indicate an inability to give his opinions during

11   deliberations.  2 RT at 668-69.  These reasons are supported by the record.  From the very

12   first questions posed to Prospective Juror 0151, he seemed equivocal.  When explaining

13   his past service as an alternate juror, he stated that he *thought* it was a criminal trial and

14   that "[s]omebody was accused of possession of rock cocaine *or something*."

15   Supplemental RT at 17 (emphasis added).  He also informed the court that he was a cook

16   at a medical center but that he did not know if he was a good cook because he had no

17   opinion of himself.  Supplemental RT at 18.  When asked about his knowledge of gangs,

18   Prospective Juror 0151 stated, "Um, that they exist, I guess.  I don't know -- I guess that

19   is about it."  Supplemental RT at 19-20.

20       The prosecutor's observation that Prospective Juror 0151 appeared uncertain about

21   some of his answers amounted to a valid, race-neutral reason for excusing him.  United

22   States v. Changco, 1 F.3d 837, 840 (9th Cir. 1993) ("Venireperson's passivity,

23   inattentiveness or inability to relate to other jurors is valid race-neutral reasons for

24   striking venireperson.").

25       Morever, a comparative juror analysis confirms the prosecutor's reasoning for

26   excusing Prospective Juror 0151.  A close review of the voir dire record shows that none

27   ─────────────

28       [11]  Prospective Juror 0151 was seated in the Juror No. 7 position when he was excused.
     2 RT at 24, 664.

of the seated jurors had difficulty answering questions directly and confidently.

For all the foregoing reasons, the state courts' rejection of Petitioner's <u>Batson</u> claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on Claim One.

**B.   Petitioner Fails to Demonstrate Error With Respect to His <u>Pitchess</u> Motion**

**1.   Background**

In Claim Two, Petitioner argues that the trial court erred when it denied Petitioner's motion under <u>Pitchess v. Superior Court</u>, 11 Cal.3d 531 (1974) for personnel records related to the gang expert.  MPA, at 22-29.

**2.   State Court Opinion**

The California Court of Appeal denied Petitioner's claim, as follows:

> Here, defendant sought all complaints against Serrata "for officer misconduct amounting to moral turpitude, including allegations of excessive force, dishonesty, false arrest, fabrication of police reports" and related misdeeds. Counsel's declaration in support of the motion stated:  "Based upon information and belief, I am informed that officer Serrata is under investigation for the use of excessive force during an arrest in or about August 2010.  Based upon information and belief, officer[ ] Serrata shot the arrestee approximately six times after the arrestee was already subdued and apprehended.  Because officer Serrata is a critical witness in the matter . . . it is imperative that the *Pitchess* motion be granted in order to ascertain information with respect to Serrata's use of excessive force, and/or the submission of false testimony, or false police reports.  [¶]  In addition, the materials obtained would be used by the defense to locate witnesses to testify as to Mr. Serrata's character traits, habits, and customs for engaging in acts untruths and, or falsifying police reports and planting evidence.  These character traits of the officer are relevant to show the officer's propensity to engage in untruthfulness, and that the officer has engaged in such conduct in this case."

> Counsel's declaration does not propose a defense or defenses to the pending charges or articulate how the discovery sought may lead to relevant evidence that would support any proposed defenses.  Deputy Serrata was not involved in the investigation of the charged crimes and defendant did not suggest how alleged prior misconduct by Serrata relates to any proposed defense.  Given the tenuous connection between unsubstantiated and speculative notions of excessive force and the officer's expert testimony, denial of the *Pitchess* motion was not an abuse of discretion.

Lodg. 4 at 13-14 (citation omitted).

**3.   Discussion**

First, Petitioner's claim is based solely in state law – he alleges only state law violations and cites only state court authority.  Thus, Petitioner's claim is governed by

18

1   California law and is not cognizable on federal habeas review.  Estelle v. McGuire, 502

2   U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

3       However, although a Pitchess motion is a creature of state law, it implicates the due

4   process right to receive exculpatory and impeachment evidence.  Harrison v. Lockyer,

5   316 F.3d 1063, 1065-66 (9th Cir. 2003).  Therefore, the procedures under Pitchess

6   operate in tandem with Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215

7   (1963), which requires the government to produce criminal defendants with favorable

8   evidence material to their defense.

9       The Supreme Court has identified three essential components of a Brady violation:

10   "The evidence at issue must be favorable to the accused, either because it is exculpatory,

11   or because it is impeaching; that evidence must have been suppressed by the State, either

12   willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527

13   U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); Hamilton v. Ayers, 583

14   F.3d 1100, 1110 (9th Cir. 2009).  To establish prejudice under Brady, the petitioner must

15   demonstrate a reasonable probability that, had the evidence been disclosed to the defense,

16   the result of the proceeding would have been different.  Hamilton, 583 F.3d at 1110.

17       Petitioner has failed to establish the gang expert's personnel file contained evidence

18   material to Petitioner's defense, and Petitioner was prejudiced by the withholding of any

19   potential evidence.  First, Petitioner has not demonstrated there was anything in the gang

20   expert's personnel file of value to the defense.  Petitioner merely speculates an alleged act

21   of excessive force by the gang expert necessarily would have resulted in the gang expert

22   falsifying police reports.  Significantly, Petitioner has not shown any potential evidence

23   of the gang expert's use of force that would have been material to the defense.  See

24   Harrison, 316 F.3d at 1066 (finding no Brady violation where the petitioner failed to

25   show police officer's personnel file actually contained complaints material to the

26   petitioner's defense); United States v. Si, 343 F.3d 1116, 1122 (9th Cir. 2003) (holding

27   "defendant has the burden of showing that withheld evidence is material" to prove a

28   Brady violation).

Second, Petitioner has not shown any of the evidence that he speculates was contained in the expert's personnel file would have been of such assistance to the defense so as to render the failure to disclose that evidence prejudicial. This is particularly true where the gang expert played a rather insignificant role at trial. The evidence of Petitioner's guilt was strong, as was the evidence of Petitioner's gang motive. Any impeachment of the gang expert with evidence he used excessive force or falsified a police report with respect to that use of force would have had little, if any, impact on the jury's deliberations.

Accordingly, the state courts' rejection of Petitioner's <u>Pitchess</u> claim was neither contrary to, nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on Claim Two.

**C.    Petitioner Fails to Demonstrate Error from the Admission of Allegedly Improper Questions by the Prosecutor**

   **1.    Background**

In Claim Three, Petitioner argues the trial court erred in allowing the prosecutor to ask an "extended and argumentative hypothetical question." MPA, at 29-33.[12] Specifically, Petitioner contends the prosecutor's hypothetical was improper because it repeated the prosecutor's version of the facts and was so lengthy as to have amounted to argument. MPA, at 31.

Petitioner's claim refers to the following portion of the record:

---

[12] Petitioner states in passing that "[w]here the prosecutor, and not the witness, present[s] evidence to the jury it amounts to unsworn testimony in violation of Petitioner's state and federal right to confront the witnesses against him." MPA, at 31. To the extent this passage was intended to present a claim under the Confrontation Clause, the Court has considered such a claim and rejected it. The Court finds, as explained below, that the prosecutor's hypothetical question was appropriate and, thus, did not amount to the presentation of evidence by the prosecutor. Similarly, to the extent Petitioner intended to raise a claim of prosecutorial misconduct, his claim fails. The prosecutor could not have committed misconduct by asking a proper hypothetical question.

Q        Deputy, I am going to provide you with a hypothetical. If an active gang member went into a party and hit up one of the party goers by asking the party goer "where are you from?" the response to that being, "from nowhere" or "I don't bang," the active gang member then stated, well, I'm going to start charging now, taxing and charging now.

Then the active gang member and several others approached three teenagers who were walking toward the entrance to the party.  The active gang member walked up to the three teenagers, two males and a female, and the active gang member, who did have a tattoo on his face, asked at least two of the three teenagers "where you from?"  The response from the two teenagers was, "I don't bang, I"m from no where."

[Defense Counsel]:  Objection.  Hypothetical too closely represents the potential facts of this matter, and as such the prejudicial affect of it extremely outweighs any --

The Court:   I don't need further argument.  Overruled.

Q        By [the Prosecutor]: One of the three teenagers approached, may have actually stated the name of a rival of the gang member.  The active gang member with the tattoo on his face then took -- turned around, took several steps, turned around again, walked up to the three teenagers and began firing his gun.

If I could go back just one regarding -- when the active gang member initially hit up the party goer inside the party, he displayed to the party goer a gun.

Once outside with the three teenagers, after he had hit up the three teenagers on the outside, hit them up, turned around, walked away, come right back, he then began shooting.

[Defense Counsel]:  Objection.

The Court:   Overruled.

[Defense Counsel]:  Objection. This is not a hypothetical.  It is an argument. Submit it.

The Court:   Overruled.
Would you complete your hypo, please?

Q By [the Prosecutor]:      The active gang member shot and killed one of the three teenagers, shot and injured another -- a fourth teenager standing behind the three teenagers, and then fled the scene.

Do you have an opinion as to whether the crimes in the hypothetical were committed for the benefit of, at the direction of, or in association with a Maywood Locos gang member?

A        Yes.

4 RT at 2137-38.

**2.        State Court Opinion**

21

The California Court of Appeal rejected Petitioner's claim on direct appeal, finding:

> Here, using a hypothetical that accurately reflected the facts of the case, the prosecutor asked Deputy Serrata if he had an opinion as to whether a murder and four attempted murders under the described circumstances were committed for the benefit of, at the direction of or in association with a Maywood Locos gang member. Serrata answered affirmatively. He explained that by asking party goers what gang they are from while displaying a gun, a gang member instills fear of the gang into the object of his inquiry as well as all witnesses to the exchange. By repeating the question to the people waiting to get into the party, and then shooting at them, the gang member compounds that fear. Word of the incident spreads throughout the neighborhood, instilling fear of the shooter and his gang into the community. Under People v. Xue Vang, 52 Cal.4th 1038, 1048 (2011), the prosecutor's hypothetical was not improper.
>
> Defendant also argues that the hypothetical was so lengthy that it essentially allowed the prosecutor to argue its case in the guise of asking a question. Although we can imagine a hypothetical that could improperly have that effect, this hypothetical did not. We conclude that there was no abuse of discretion in allowing the expert to answer the challenged hypothetical.

Lodg. 4 at 14-15.

### 3.    Discussion

First, to the extent Petitioner asserts the trial court's admission of the challenged question violated California rules of evidence or the California state constitution, his claim is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

Second, Petitioner has not shown a violation of state law, much less a violation of Petitioner's federal constitutional rights. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended on reh'g, 421 F.3d 1154 (9th Cir. 2005). The "[a]dmission of evidence violates due process '[o]nly if there are *no* permissible inferences the jury may draw from it." Boyde, 404 F.3d at 1172 (quoting Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991)) (emphasis in original).[13]

---

[13] For the purposes of this analysis, the Court assumes that the prosecutor's hypothetical question amounted to the "admission of evidence." Of course, the Court recognizes Petitioner's jury was instructed "[n]othing that the attorneys say is evidence. . . . Their questions are not evidence." 4 RT at 2455. The Court presumes the jury followed this instruction and did not consider the prosecutor's hypothetical question as

22

1    Under California law, the elements of the criminal street gang enhancement may be

2  proven by expert testimony.  People v. Martinez, 158 Cal.App.4th 1324, 1332 (2008).

3  "[A]n expert may render opinion testimony on the basis of facts given in a hypothetical

4  question that asks the expert to assume their truth."  See People v. Gardeley, 14 Cal.4th

5  605, 618 (1996) (internal quotation marks and citation omitted).  Not only is a prosecutor

6  permitted to base her hypothetical question on the facts of the case at hand, "[s]uch a

7  hypothetical question *must* be rooted in facts shown by the evidence."  Id. (emphasis

8  added).  The prosecutor's hypothetical closely matched the facts shown by the evidence.

9  In fact, defense counsel objected to the question for the very reason that the hypothetical

10  was patterned after the facts of the case.  See 4 RT at 2137.  Pursuant to state authority

11  and the facts presented at trial, a permissible inference flowed from the prosecutor's

12  question, i.e. that a crime such as the one at issue here violated California's street gang

13  statute.

14    Accordingly, the state courts' rejection of Petitioner's claim regarding the

15  prosecutor's hypothetical question was neither contrary to, nor an unreasonable

16  application of, clearly established federal law.  28 U.S.C. § 2254(d).  Petitioner is not

17  entitled to habeas relief on Claim Three.

**D.  Petitioner Fails to Demonstrate That the Evidence Presented at Trial Was**

**Insufficient to Prove the Murder was Premeditated**

**1.    Background**

21    In Claim Four, Petitioner argues the evidence presented at trial was insufficient to

22  prove premeditation in light of the fact the shooting was spontaneous and sudden.  MPA,

23  at 33-39.

24  ///

**2.    State Court Opinion**

26    The California Court of Appeal denied Petitioner's claim, explaining, "the

evidence.  Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727

(2000).

premeditation finding was supported by substantial evidence of motive and manner of killing[,] [i]n particular . . . the evidence that defendant fired at Bryan multiple times from close range after asking him the portentous question, "Where are you from?," Andy's testimony that defendant shot at Bryan after Bryan identified himself as a member of the Orchard Locos, and the gang expert's testimony that the Maywood Locos considered the Orchard gang to be rivals." Lodg. 4, at 15.

### 3. Legal Standard

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Wright v. West, 505 U.S. 277, 284, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992).  "Put another way, the dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc) (quoting Jackson, 443 U.S. at 318).

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution. Jackson, 443 U.S. at 326.  "Jackson cautions reviewing courts to consider the

1  evidence 'in the light most favorable to the prosecution.'"  Bruce v. Terhune, 376 F.3d

2  950, 957 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 319).  Additionally,

3  "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a

4  conviction."  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

5  The federal court must refer to the substantive elements of the criminal offense as defined

6  by state law and look to state law to determine what evidence is necessary to convict on

7  the crime charged.  Jackson, 443 U.S. at 324 n.16; Juan H., 408 F.3d at 1275.

8      The Jackson standard applies to federal habeas claims attacking the sufficiency of

9  the evidence to support a state conviction.  Juan H., 408 F.3d at 1274; Chein, 373 F.3d at

10  983; see also Bruce, 376 F.3d at 957.  The AEDPA, however, requires the federal court to

11  "apply the standards of Jackson with an additional layer of deference."  Juan H., 408 F.3d

12  at 1274.  The federal court must ask "whether the decision of the California Court of

13  Appeal reflected an 'unreasonable application' of Jackson and Winship to the facts of this

14  case."  Id. at 1275 & n.13.

15      **4.    Discussion**

16      Under California law, first degree murder is any willful, deliberate, and premeditated

17  killing.  Cal. Pen. Code §§ 187, 189.  A premeditated killing is a "killing [that] was the

18  result of preexisting reflection and weighing of considerations rather than mere

19  unconsidered or rash impulse."  People v. Prince, 40 Cal.4th 1179, 1253 (2007) (citation

20  and internal quotation marks omitted).  The process of premeditation and deliberation

21  "does not require any extended period of time."  People v. Koontz, 27 Cal.4th 1041, 1080

22  (2002) (citations omitted).  "The true test is not the duration of time as much as it is the

23  extent of the reflection.  Thoughts may follow each other with great rapidity and cold,

24  calculated judgment may be arrived at quickly."  Id. (citation and internal quotation

25  marks omitted).  Planning activity, motive, and the manner of the killing are significant,

26  though not the exclusive factors to consider when determining whether the killing was a

27  result of preexisting reflection.  Prince, 40 Cal.4th at 1253. (citations omitted).

28      Viewing the evidence in the light most favorable to the prosecution, a rational trier

25

of fact could have found the instant murder was premeditated.  Yet, this was not the sole evidence of Petitioner's premeditation.  Petitioner attended the party armed with a gun.  2 CT at 258-59, 296-97, 301-02, 313; 3 RT at 1547, 1554; 4 RT at 1830-32.  He then confronted the victim and asked about the victim's potential gang affiliation.  2 CT at 312-13; 3 RT at 1508.  After asking the victim where he was from, Petitioner opened fire and discharged multiple rounds toward the victim at close range.  2 CT at 313; 3 RT at 1508, 1542-46.  The victim was struck four or five times.  2 CT at 318-46; 4 RT at 1815-23.  Moreover, Petitioner's use of a firearm against a defenseless and unsuspecting person, without more, supports the jury's finding.  See Koontz, 27 Cal.4th at 1081-82; see also People v. Bolin, 18 Cal.4th 297, 332-33 (1998).  This evidence overwhelmingly supported the jury's finding that Petitioner premeditated the killing.  See People v. Silva, 25 Cal.4th 345, 369 (2001) ("The manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder.").

Accordingly, the state courts' rejection of Petitioner's sufficiency of the evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Thus, habeas relief is not warranted on Claim Four.

**E.  Petitioner Fails to Demonstrate a Violation of His Right to a Jury Trial**

**1.  Background**

In Claim Five, Petitioner argues the trial court violated his right to a jury trial "when it imposed large fines on him without placing factual issues before the jury."  MPA, at 39-42.

**2.  State Court Opinion**

The California Court of Appeal rejected Petitioner's claim, finding he was not entitled to a jury trial on the issue of the fines imposed.  Lodg. 4, at 17.

**3.  Discussion**

In order to invoke federal habeas corpus jurisdiction, a prisoner must assert his custody violates federal law.  28 U.S.C. § 2254(a).  An imposition of a fine "is not

26

1  sufficient to meet § 2254's jurisdiction requirements." Bailey v. Hill, 599 F.3d 976, 979

2  (9th Cir. 2010).  Here, Petitioner challenges the restitution fine the trial court imposed on

3  him, not "the very fact or duration of his physical imprisonment." Preiser v. Rodriguez,

4  411 U.S. 475, 500, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973).  Therefore, Petitioner fails to

5  state a cognizable claim.

## VII.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an

Order: (1) accepting this Final Report and Recommendation; (2) denying the Petition;

and (3) dismissing this action with prejudice.

DATED: March 27, 2015

_____
HON. KENLY KIYA KATO
United States Magistrate Judge

27